STATE of Tennessee, Appellee,

v.

Gregg A. HAMRICK, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Jan. 29, 1985.

Permission to Appeal Denied by Supreme Court April 1, 1985.

William M. Leech, Jr., Atty. Gen. & Reporter, Wayne E. Uhl, Asst. Atty. Gen., Nashville, Charles Hawk, Dist. Atty. Gen., Edward Bailey, Roger Delp, Asst. Dist. Attys. Gen., Kingston, for appellee.

Alfred Lee Hathcock, Jr., Lenior City, for appellant.

## OPINION

O'BRIEN, Judge.

The defendant, Hamrick, was jointly indicted by the Loudon County Grand Jury with Joe Dyer and Harold Dean Johnson on a charge of assault with intent to commit first degree murder. At a joint trial, which lasted some five days, Dyer and Johnson were acquitted. Defendant was found guilty of aggravated assault. At a sentencing hearing he was found to be a Range I standard offender and sentenced to serve four (4) years in the penitentiary.

Defendant presents a number of issues by several of which he contests the weight and legal sufficiency of the evidence. In order to address this issue a review is essential of the evidence presented during this five day trial. John Randall Underwood was severely burned on the evening of August 19, 1982, according to his testimony, about 10:30 to 10:35 p.m. He testified the three defendants attacked him from behind, in an alley near his mother's house, pushed him to the ground, poured gasoline on his back and set him afire. It is not contested that Underwood's injury was primarily caused by the ignition of some flammable substance, identified as gasoline. The record seems to indicate that the intensity of the flame was enhanced by the burning of a polyester shirt he was wearing at the time. The injuries sustained by him were about the upper part of his body.

The evidence leading up to, and surrounding, the incident in which Underwood was injured is hotly contested and contradictory. The defendants presented an alibi defense, supplemented by the testimony of nearly twenty witnesses. The difficulty in pinpointing the verity of this defense is compounded by the fact that the majority of these witnesses approximated the time at which they placed each of the three defendants at a place other than where the offense occurred. Dyer, Johnson and Underwood appear to be in accord that they were together on August 19, 1982, and on either the 17th or the 18th of August also. Johnson had possession of Hamrick's black, Pontiac automobile. From this point onward, their stories differ. Dyer and Johnson say that Underwood was traveling with them for the purpose of trying to sell some automobile hubcaps. They both testified,

and there was some corroboration, that Underwood was given the use of the automobile on one or two occasions during this interval, and went off by himself endeavoring to dispose of the hubcaps which, it is implied, he had stolen. It is not refuted that on the 19th of August, he bought $5 worth of gasoline for the automobile on credit, leaving his driver's license and Hamrick's automobile registration number as security until the purchase price was paid. Underwood says Johnson persuaded him to purchase the gasoline so they could go to Madisonville, an adjacent community, to work at a roofing job he was engaged in there. Dyer and Johnson say he purchased the gasoline in order to have the use of the car in his endeavor to sell the stolen hubcaps. Hamrick, who had been out of town on a trip with his employer, returned on the 19th and learned from Dyer and Johnson about the connection between his automobile and the gasoline, and the stolen hubcaps. At about 6:00 o'clock he confronted Underwood about payment for the gasoline. Underwood testified he agreed he would pay for it. This meeting seems to have concluded with a reasonable degree of amenity. Subsequently Hamrick confirmed through a telephone call with a county police officer that his car was connected with the gasoline purchase, as well as a stolen hubcap investigation. It is from this point on that the time element becomes highly crucial, as well as almost hopelessly confused.

Underwood testified that about 9:00 p.m. he had met with his estranged wife on a neighborhood street corner. As they were engaged in conversation Hamrick, approached on foot, as he put it, "cussing and hollering about the gas bill that I owed him. He said that the cops were after his car, or something, and I'd better take care of it." An altercation arose between Hamrick and Underwood's wife, with him standing in the background. Hamrick left about 9:15 p.m. Underwood then went home, borrowed $5, and went to the service station to pay the gas bill. The next pertinent time in his testimony was about 9:45 when he saw all three defendants standing in

front of Hamrick's house while he was walking from his home to that of his brother-in-law. He returned to his mother's house, and at ten minutes pass ten by the clock, which he says was accurate, he left again. After lingering about outside the residence for ten or fifteen minutes he then decided to walk back to his brother-in-law's house to make another attempt to see his wife. As he was walking through an alley, two or three blocks from his house, he was attacked from the rear and knocked to the ground. He was stunned by a blow to his head but recognized Hamrick who was pouring gasoline on him. He says while Johnson held him Dyer took a match out of a matchbook, lighted it, and then the rest of the book, and threw the matches on him. He estimated the time of the attack to be between 10:30 and 10:35 p.m.

Mrs. Doris Underwood, the victim's mother, fixed the time when he returned to his home in a burned condition to be around 10:30 p.m. The family administered first aid and due to her hysteria it was some fifteen minutes before she went to a neighbor's to place a telephone call for an ambulance. It took another fifteen minutes for help to arrive. The ambulance came at 11:01 p.m.

Officer Tom Jessen of the Loudon County Sheriff's Department testified that Hamrick called him at 8:50 p.m. on August 19, 1982. He returned the call at 9:10 and advised Hamrick about the gas purchase and the stolen hubcaps, and that his automobile was involved. Hamrick called again about 9:30 and told him that Underwood was going to pay the gas bill and informed him where the hubcaps were hidden.

Hamrick testified and confirmed he had placed the first call to Jessen at 8:50 p.m. He said that between 9:30 and 9:35 he left his house to go to his employer's residence, a short distance away, to get his employer's automobile which he intended to use to take Johnson to visit his mother at the hospital. The police confirmed that he was in a neighborhood convenience store at 9:45 p.m.. He says he then went up Interstate Highway 75 toward Knoxville to Cedar

Bluff Road and arrived at the Park West Hospital at 10:10 p.m. according to the clock in the automobile. He let Dyer and Johnson out of the automobile and watched as a security guard admitted them to the hospital. He then drove back home, where he says he arrived at 10:31, by the clock. He then showered and was standing in the living room combing his hair when he heard a siren which sounded to him like a fire truck. The sound came from behind the house.

Mrs. Ruby Hamrick, mother of Gregg Hamrick, testified the three defendants left her home a little before 10:00 o'clock to go to the Park West Hospital. She said that Hamrick returned from the hospital about quarter to eleven. She explained that an earlier statement to the police that it might have been about eleven o'clock when he came in was in error because he was there before the 11:00 o'clock television news came on. She testified that he was lying on the bed when they heard the ambulance go by and he commented that it sounded as if it were right at the back alley.

Joe Dyer testified it was between 9:30 and 10:00 o'clock when Hamrick took them to the hospital. They were going to sit up that night at the hospital with Johnson's mother because she was in critical condition. When they arrived at the hospital a little past ten the security guard let them in. He was aware of the time because of a television program which was on when they entered the waiting room in the hospital. They remained at the hospital until about 1:00 a.m., after Mrs. Johnson had expired. They returned to the Hamrick home about 1:30 a.m. This was confirmed by the police. In a prior statement to the police he said they arrived at the hospital about 9:30 p.m. The distance from Lenoir City to the hospital was about eleven miles.

Dyer presented nearly twenty witnesses, all of whom were relatives or family friends of Dean Johnson. All of these witnesses placed Dyer and Johnson in the hospital prior to or in the vicinity of 10:00 o'clock. One of these, Barbara Gossage, testified she had taken an elderly friend home from the hospital and delivered her to her apartment in the neighborhood where the attack on Underwood allegedly took place. She was parked in the alley in the vicinity of where it was supposed to have occurred for ten or fifteen minutes about 10:30 to 10:35 p.m. on the night of August 19th. Nothing unusual occurred while she was there.

Johnson did not testify. In an earlier statement to the police he says they left the Hamrick home about 9:10 or 9:15 p.m. Hamrick had some errands to run for his employer and they arrived at the hospital about 10:25 p.m. or a little later. He told the officers they went by the old road to the hospital, as opposed to the interstate highway. His statement to the police confirmed Dyer's testimony that when they arrived back at the Hamrick house from the hospital about 1:00 a.m. they were met by the police who questioned them about the assault on Underwood.

Michael Ray Davis, security guard at the hospital, testified that Johnson and Dyer arrived at the hospital between 10:35 to 10:40 p.m. in a gold colored Ford. The hospital doors were secured at 8:30 p.m. and he was stationed at the south entrance between 10:30 and 11:30 to observe incoming and outgoing personnel at the shift change. He had just begun this procedure when defendants arrived at the hospital. He remembered the time because there was a lull in the pedestrian traffic through the doors at this particular hour. On cross-examination he agreed that another such lull occurred between 11:15 and 11:30 and it was just as likely defendants could have arrived at that hour.

The evidence clearly establishes that the assault on Underwood took place somewhere between 10:30 and 11:00 p.m. on the night in question. The majority of the witnesses put Dyer and Johnson in the hospital sometime before 10:00 o'clock and there is no evidence whatsoever in the record that they left from there prior to 1:00 a.m. the next morning. On the other hand Hamrick claims they arrived at the hospital at ten after ten. Dyer testified

they arrived a little past ten o'clock which contradicted his statement to the police that they arrived at 9:30. Johnson's statement to the police placed them at the hospital at 10:25, or a little later. The only completely unbiased, impartial witness to testify was the security guard who placed the three of them at the hospital entrance between 10:35 to 10:40. Under the evidence the other time settings by all the witnesses were vague, or impossible if defendants are to be believed, to the point that the jury could properly have concluded all of the defendants could have participated in the assault. For whatever reason they chose to acquit Dyer and Johnson, but convicted Hamrick. On the issue of the sufficiency of the evidence the United States Supreme Court has said:

"... The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be.... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' (Citation deleted). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (Citation deleted). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson v. Virgin-*

*ia*, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

The court went on to say:

"the question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder (sic)—if known." *Jackson v. Virginia*, supra, 99 S.Ct. p. 2789, note 13.

 It is an equally sound principle that verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency. *Pulley v. State*, 506 S.W.2d 164 (Tenn.Cr. App.1973). The evidence in this case meets the requirements of *Jackson*, supra, and T.R.A.P. Rule 13(e).

Defendant contends he was denied effective assistance of counsel at trial because of his attorney's acute illness during the trial. The trial judge stated as part of his ruling at the hearing on the motion for new trial that he was aware that Hamrick's counsel was having difficulty during the trial, and that at one time he had been taken to Loudon County Memorial Hospital. As the result of these happenings the trial judge consulted with counsel personally to observe his condition, and informed him at the time that the court would declare a mistrial if he was unable to continue. Counsel informed the trial judge that he was having some difficulty, but after he had rested, had been administered some insulin, and had something to eat, he was feeling good enough to continue. The judge continued to observe him during the course of the trial and when there was any appearance of his having further difficulty recesses were called. During the recesses the judge discussed the trial with counsel and observed that he was totally lucid about every portion of the trial. The trial judge was satisfied with the quality of counsel's judgment and was convinced

from his discussions with him and his observations at the time that he was competent to continue. Counsel relies on our Supreme Court case of *Baxter v. Rose,* 523 S.W.2d 930 (Tenn.1975) in which the court chose to measure the range of competence demanded of attorneys in criminal cases by the criteria set forth in *United States v. DeCoster,* 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973); and the Sixth Circuit case of *Beasley v. United States,* 491 F.2d 687 (6th Cir.1974), and declined to establish any precise nomenclature or lay down any specific standards or guidelines for that purpose.

■ Quite recently, in *Strickland v. Washington,* — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court discussed *DeCoster,* supra, among various other federal decisions, in analyzing the proper standard for attorney performance in defense cases. In doing so they held that a convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First the defendant must show that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense.

We are in accord with the judgment of the trial court in this case that trial counsel was neither incompetent nor ineffective. While the record shows defendant's counsel was beset with physical ailments at the time of trial the court below was aware of his infirmity and took careful note to see that he was able to perform as defense counsel. We find nothing in the record to suggest Hamrick's counsel did not function effectively. Moreover, both Dyer and Johnson were represented by competent and capable counsel. There was nothing incompatible in the defense raised by the three defendants. They joined in a mutual trial strategy. There is nothing in this record to show that the defendant was not adequately represented.

■ Defendant says the sentence imposed upon him evidenced the failure by the trial judge to consider mitigating factors in the case. Defendant does not set out in his brief any of the mitigating factors which he considers to be in his favor, nor do we, after an examination of T.C.A. § 40–35–110 find enumerated there any factors which would militate in defendant's favor. The sentence was properly imposed in accordance with the provisions of T.C.A. § 40–35–109(a) and T.C.A. § 40–35–501(c). Defendant received a Range I sentence with a release eligibility classification of thirty percent (30%). The punishment for aggravated assault is a penitentiary sentence of not less than two (2) nor more than ten (10) years. T.C.A. § 39–2–101(c). The sentence of four (4) years was well within the statutory limits prescribed for the conviction offense and thus is not to be considered excessive. *Tillery v. State,* 565 S.W.2d 509 (Tenn.Cr.App.1978).

The judgment of the trial court is affirmed.

WALKER, P.J., and DWYER, J., concur.