IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2008

## STATE OF TENNESSEE v. DALTON LISTER

**Appeal from the Criminal Court for Bradley County**
**No. M-05-072     Carroll L. Ross, Judge**

---

**No. E2007-00524-CCA-MR3-CD - Filed June 29, 2009**

---

The defendant, Dalton Lister, appeals from his jury convictions in the Bradley County Criminal Court for first degree felony murder; two counts of attempted aggravated robbery, a Class C felony; and conspiracy to commit aggravated robbery, a Class C felony. He received a life sentence, with concurrent sentences of six years as a Range I, standard offender for each Class C felony. On appeal, the defendant contends (1) that the evidence was insufficient to convict him of the charged offenses; (2) that the trial court erred in not permitting cross-examination regarding a severed defendant's outstanding arrest warrant, pending charges, status as a fugitive, and possible bias to fabricate testimony to obtain a favorable disposition of the pending charges; (3) that the trial court erred by failing to suppress a recorded statement of the defendant when the original recording was intentionally destroyed and lost by the detective who had possession of it; and (4) that the trial court erred in not ordering disclosure of the detective's statement to the Tennessee Bureau of Investigation concerning the lost and destroyed original recording of the defendant's statement taken the night of the homicide. We hold that the evidence was sufficient to convict the defendant of the charges and that the defendant waived his remaining issues by not filing a timely motion for new trial, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Charles Richard Hughes, Jr., District Public Defender, for the appellant, Dalton Lister.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Robert Steve Bebb, District Attorney General; and Kristie Luffman, Sandra Donaghy, Stephen Crump and John Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the armed entry by the defendant and a co-defendant into the hotel room of Beto Villalobos and Julius "K.C." Shapley and the ensuing shooting and death of Julius "K.C." Shapley on December 22, 2004. The defendant, Tony Kincaid, and Heather Massengill were tried together. A fourth defendant, Richard Jerger, was severed from the trial and testified as a witness for the State.

At the trial, Scott Parker testified that he worked with the defendant and Richard Jerger in a roofing company Parker and Jerger owned. He said the defendant stopped working there after he called the witness and asked him to "go with him to do a robbery." He said he did not accept the defendant's offer. Parker said the defendant told him that some people from Texas were coming to see him and that these people would have money and drugs. He said this conversation occurred one or two weeks before Christmas. On cross-examination, Parker testified that he did not alert the police because he did not take the defendant's claim seriously. He said he had not met co-defendant Kincaid. He said he continued to speak with Jerger after the events giving rise to the present case. He said he had spoken to Jerger's wife, Debbie, about talking with a detective and that he was "good friends" with Jerger. He said he did not know that Jerger had previously robbed a liquor store. On redirect examination, he testified that he stopped speaking to the defendant the day the defendant told him about the robbery plans. He said he terminated the defendant's employment that day, as well.

Jason Taylor, the manager of a local Wal-Mart, testified that detectives asked him to review recent purchases of ammunition, although he did not remember which specific type. He stated the store kept a record of all sales, which were tracked to specific registers and labeled with the time and date of the sale. He said he gave the detectives a copy of the store's video surveillance film.

Janice Rezeppa, a Wal-Mart employee, testified that she worked in the sporting goods department the night of December 22, 2004, when a "younger girl" came to the store to buy .380 ammunition. She said she explained the difference in the uses of ammunition, whether for target practice or for home protection, and she said the girl chose the home protection-type bullets, which were the "jacketed hollow points" bullets. She said the girl was around 5'5" or 5'6" and weighed 160 to 170 pounds. She said that when ringing up the sale at 8:46 p.m., she asked for the girl's birth date, which was recorded on the receipt as "9/21/78." She said her employee number, the store number, the register number, and the time of sale were also recorded on the sales receipt. She said that the store manager called her to the store office a few days after this sale to watch the video surveillance film and that he asked her if she remembered anything about this particular sale. Rezeppa answered questions about the sale, and the tape of it was played in court but not included in the record. She said that she spoke mainly to the first girl because the second girl who came with the first girl did not say much. She identified this first girl, the one who asked about the ammunition, as a co-defendant present in the courtroom.

Doctor Ronald Toolsie testified that he was a pathologist at Bradley Hospital in Cleveland, Tennessee. The parties stipulated that he was an expert in pathology. He said that although most pathologists do not perform autopsies, he performed autopsies and that he performed the autopsy of the victim, Julius Angelo Shapley, on December 23, 2004. He stated that the victim's manner of

death was a homicide and that the victim bled to death. He said the victim's aorta had been torn by a large caliber gunshot wound to the abdomen. He said that although the victim weighed approximately 300 pounds, he had no contributing natural disease. He estimated that if the victim had been treated immediately after being wounded, he might have survived, but he said the wound was almost always fatal. He said that in addition to the aorta laceration, the victim's liver and stomach had been torn. He said that if the victim had survived, he would have had a spinal injury because the bullet came to rest in the victim's backbone. He said he removed the bullet and submitted it to the TBI along with the victim's blood sample and clothing. He said the victim's body had no offensive or defensive injuries, which he explained as scratches and bruises on the forearms or the back or front of the hands. He also said the victim's body had no stippling, which is embedded soot and unburned gunpowder, that would indicate the weapon had been fired within a few inches of the victim's body. He stated, however, that clothing would catch the particles which could explain why no stippling was found on the victim's body. He also agreed that the presence of a potato on the end of the barrel when the gun was fired might explain the lack of stippling on the victim's body.

On cross-examination, Dr. Toolsie testified that the single entrance wound was a non-contact wound, where the weapon was fired anywhere from a few inches to a few yards away from the victim's body. He said that analysis of the victim's blood sample revealed the presence of a metabolite of marijuana; a non-specific drug in the class of Valium; another drug "almost certainly given to him immediately before his exploratory surgery"; and alcohol at a blood alcohol content of 0.04. Dr. Toolsie stated that each of these sedatives would synergistically increase the effects of the other sedatives. In Dr. Toolsie's words, "A little bit of a lot of drugs will produce a lot of sedation." He stated that it was possible for someone to exert great force on another person's neck but leave no bruises or marks, except for fingernail impressions if the assailant dug in his fingernails.

James Russell Davis II, a special agent and forensic scientist in the TBI crime laboratory's microanalysis section, was accepted as an expert witness in gunshot residue and its testing. He testified that he analyzed a pair of coveralls, the victim's red shirt, and "potato remains" taken from the floor of the crime scene. He said he found gunshot primer residue, which consists of particles emitted in the process of firing a gun, on the coveralls and in the potato remains. He said this meant the coveralls and the potato were in the vicinity of a weapon when it was fired. He said the victim's red shirt had a fine powder on it that was consistent with potato starch. The witness stated that another way of finding gunshot powder residue was to examine someone's hands after treating them with a certain type of acid. He said a shooter's hands are closest to a handgun and that the concentration of barium, antimony, and lead he looks for would be greatest there. He stated that these elements are toxic to the human body and are not naturally occurring in the body. Referring to a shooter's clothing, he stated the distance of the body from the weapon affected how much gunshot residue would be found on, for example, the shirt part of the coveralls as opposed to the pants. He stated that the gunshot residue on a gun could be transferred from person to person if a second person handled the gun after it had been shot.

Mr. Davis testified that he analyzed the gunshot residue tests of Beto Villalobos, who was the second victim of the attempted aggravated robbery, the defendant, and Tony Kincaid, a co-

defendant. The witness stated that for each test, the results were inconclusive. He explained that he looked for a certain ratio of the three elements of gunshot residue. He said that when this ratio was not present or when the quantity of the elements was insufficient, he could not state what had occurred. He said this meant he could not eliminate the possibility that each person had fired, handled, or been near a gun when it fired. He also stated that gunshot residue could be rubbed off through contact or through washing one's hands.

Teri Arney, a forensic scientist with the TBI crime laboratory's firearms identification unit, was stipulated to be an expert witness regarding firearms. She testified that she examined two firearms, several magazines, fired and unfired bullets, and cartridges in connection with the instant case. She said the serial number of the first gun she examined, a ".44 special," had been "obliterated." She said she determined that a fired cartridge submitted with this gun had been fired from the gun. She said the bullet removed from the victim was the same caliber as the gun, although it was damaged. She also stated that the bullet was the type she would expect to see loaded in the gun. She said she could not, however, state that the bullet was fired from the gun due to the damage and lack of markings, although she said that the bullet shared the same class characteristics as a bullet fired from the gun. She testified that she test-fired a bullet from the gun and that the gun did not put markings on the cartridge in a way she could use for identification. She said the lack of marking ability was due to the gun's age. She said she could not match the bullet taken from the victim to the gun.

Ms. Arney testified that the second gun she analyzed, a Jennings "Model 48, .380 auto" was inoperable upon receipt. She said two problems prevented the gun from firing: (1) a broken firing pin, and (2) the trigger bar was out of alignment. She said this gun's magazine contained five bullets, which she also analyzed.

On cross-examination, Ms. Arney testified that she could not conclude the bullet taken from the victim was fired from the .44 caliber gun. She stated that the gun's age prevented it from imprinting bullets with microscopic markings that would link the bullet to the gun. She said, however, that the bullet was the correct caliber for the gun and had the same rifling characteristics as the bullet she test-fired. She said the second gun was not obviously inoperable unless someone either opened a "slide" to see the broken firing pin or attempted to fire the gun. She said each defect would independently prevent the gun from firing. Regarding the bullets in the magazine, she said they were Winchester, brass-enclosed base bullets. She said the nose "would have some exposed lead," while the base was made of brass. She testified that the TBI analysts were not able to determine whether a specific bullet came from a specific package of bullets, although she said the FBI performed that type of analysis. She stated that she had not been asked to perform this type of analysis.

Gary Webb testified that he stayed at the Classic Suites Hotel in Cleveland, Tennessee, the night of December 22, 2004. He said that during the night, a "couple" of men knocked at his front and back doors "several" times and asked for "Michelle." He stated that the two men were approximately the same height and were 5'10 or 5'11. He said one of the men was heavier-set than the other and was African-American, while the second man was "lighter skinned." He said that the heavier-set man was the "talker" and seemed agitated. He said the second man was apologetic. On

cross-examination, he testified that he stayed in Room 13 and that he did not hear any gunshots that night. He identified the two men as the two male defendants, although he conceded that it had been some time since he had seen them.

Beto Villalobos from Leport, Texas, testified that he had been one of Julius Shapley's best friends and that he had known him as "K.C." He said he and K.C. had known each other for seven or eight years. He stated that the defendant used to live up the street from K.C. and that he, K.C., and the defendant were friends. He said that he knew Heather Massengill as the defendant's girlfriend but that he did not know her well. He said he had visited their home in Cleveland in the past and had met their daughter. He said he and K.C. had come to Cleveland at Christmastime along with K.C.'s cousin Larry and their friend Tommy. He said they stayed at the Classic Suites Hotel during the stay when the events giving rise to the present prosecutions occurred. He stated that he came to Cleveland to be paid some money owed him and to have fun for a while. He said he wanted to go hang gliding in Tennessee, as it was a hobby of his. He admitted that he was a drug dealer and that he had been collecting money owed in his drug trade. He said he did not transport a new supply here to be sold because two dealers, Chris Baxter and Derrick Hartline, working for him still had a supply of marijuana to sell. He stated that the defendant had told him that marijuana sold for a higher price in Tennessee than in Texas and that they began trafficking it here through Chris Baxter, to whom he said the defendant had introduced him. He said he sold drugs because he could not find another job.

Mr. Villalobos testified that he and K.C. each lent the defendant $1000 to purchase marijuana from them. He said the plan had been for the defendant to repay them $1500 each from the money he would earn through selling the marijuana. He stated that the defendant did not repay them and that they came to recover their money. He said, however, that he took no steps to recover the money once he was in Cleveland. He stated that Chris Baxter and Derrick Hartline owed him money and that he did not worry about the money the defendant owed him.

Mr. Villalobos testified that Detectives Duff Brumley and Guy Ferguson questioned him on December 23, 2004, the day after K.C. died, at Derrick Hartline's house. He said he told them that he was in Cleveland to collect money the defendant owed him and that he had transported drugs to the area. He stated he was in jail at the time of the trial for his convictions for possession of marijuana, possession of cocaine, and possession of a firearm. He said he had been found with cocaine on his person, that law enforcement obtained a search warrant for his home, and that they found marijuana and K.C.'s gun, which he said he kept for sentimental reasons. He said he had a conviction for possession of a stolen handgun, which he said he had unknowingly purchased.

Mr. Villalobos testified that on December 22, 2004, he was at the Classic Suites Hotel with K.C., Larry, and Tommy, where he had slept most of the day. He said he awakened around 9:00 or 9:30 p.m. He said that K.C. was in the living room with a woman and that he decided to get a meal. He said he drove to a nearby fast-food restaurant, purchased his meal, and returned to the hotel. He said that he initially decided to eat in the bedroom to give the pair some privacy but that he decided to join them in the living room watching television. He said the woman inquired about her ride home, that K.C. dialed a telephone number, but that he received no answer. He said all three of them smoked a "joint."

Mr. Villalobos testified that he heard someone at the hotel room's back door. He said that he heard mumbling in response to his questions and that he recognized the defendant when he opened the door. He said the defendant asked if Michelle were there. He said he told him she was and then locked the door. He said he told Michelle that the defendant was at the door, that she then got up from the couch to retrieve her shoes and purse, that he opened the door for her to leave, and that Michelle "froze" when the door was opened. He said the defendant's body language and statement, "What's up" told him he wanted to fight. He said he removed his jewelry to fight the defendant and called to K.C. He stated that he thought the defendant would remain at the door but that the defendant walked into the bedroom, through the doorway, and into the living room with his gun drawn. He said the defendant told him,"Give it up, give it up. You all motherf------ think I robbed you before. I'm gonna really rob you now. Where's the s--- at? Where's the money at? Give it up." He said that at that point, another man, whom he identified as co-defendant Kincaid, ran into the hotel room holding a gun that had a potato stuck on the end of the barrel. He said that this man, the defendant, K.C., and he were all yelling at each other and that co-defendant Kincaid's comments were similar to the defendant's with the exception of "Don't make me kill you . . . ." Mr. Villalobos said he and K.C. were telling the two intruders to lay down their guns. He said the two men told him to give them his jewelry, the drugs, and the money. He stated that he was "scared" for his life and that he opened the front door for the hotel office to see what was going on in the hotel room. He said the defendant jumped in front of him and slammed the door shut while telling him he would shoot him if he opened the door again. He said the defendant told Mr. Kincaid not to shoot K.C. but instead to shoot "the Mexican." He said that he and K.C. glanced at each other, that he rushed at the defendant and knocked him down, and that Mr. Kincaid and K.C. were struggling with each other. He said their glance was his way of communicating to K.C. that because they were going to shoot him, he would try to rush the defendant. He stated he and the defendant were fighting on the ground when he heard a gunshot. He said he and the defendant continued to fight in the kitchen area and knocked over the kitchen table. He stated the defendant told him, "We just came to scare you. . . . I wasn't gonna hurt nobody." He said that at that moment, K.C. and Mr. Kincaid were in the bedroom area and that he could not see them while he fought the defendant. Mr. Villalobos stated that after trying in vain to find a kitchen knife or other object in a drawer to use against the defendant, he chased the defendant out the back door. He said he opened the front door and went to the bedroom, where he saw Mr. Kincaid "sliding out from under K.C." He said that Mr. Kincaid ran out the back door and that when he next saw K.C., he was falling from the bed onto his knees. He said K.C. lifted up his shirt to show him the wound and said that he had been shot. Mr. Villalobos said that the hotel office called their room to inquire about the situation and that he told them to send an ambulance. He said he was immediately connected to the 9-1-1 service and that police arrived soon afterwards.

Mr. Villalobos testified the defendant held a chrome pistol in his hand and identified it as the one in evidence. He said Mr. Kincaid held a black revolver with a potato stuck on the end of the barrel and wore a blue jumpsuit. He identified the defendant and Mr. Kincaid as the intruders. A 9-1-1 call was played for the jury, but it has not been included in the appellate record.

On cross-examination, Mr. Villalobos testified that when he testified in the preliminary hearing approximately one month after the shooting that he had come to Tennessee to "have a good time before my friend went to jail," this included recovering money that he was owed, although he

acknowledged that he did not explicitly say that at the hearing. He also stated that he intended this meaning in his statement to Det. Felton after the shooting. He stated K.C. was married and had children in Texas. He said that neither he nor K.C. knew Michelle Bunting before coming to Tennessee in late December 2004. He identified her as the woman in their hotel room whom the defendant came to pick up. He disagreed with defense counsel's statement that he brought two "enforcers" with him to Tennessee, Tommy and Larry, saying that they were "really small guys." He stated that although his preliminary hearing testimony was that he did not know Mr. Kincaid and that he did not remember what he said the night of the shooting, he was still in shock from the events at the preliminary hearing and that he had been able to think about that night in the intervening time. He also said that he spoke with Mr. Baxter and Mr. Hartline and that he spoke with a detective at Mr. Hartline's home. He stated that K.C. did not have time to touch Mr. Kincaid before he was shot, although he said he did not observe them fighting in the bedroom. He said that he smelled alcohol on the defendant's breath.

Mr. Villalobos admitted that he was now an inmate in the Texas Department of Corrections, having been convicted of two felony cocaine offenses. He also admitted a conviction for domestic assault for burning his girlfriend with an iron. He said K.C. was about to begin a prison sentence for possession of an illegal firearm. Villalobos said he told the detective, who was secretly recording their conversation, that he "came to collect. . . . came to get [his] money" from the defendant. He said neither he nor K.C. had any guns during the fight. He also acknowledged that he did not tell the 9-1-1 operator that the defendant was the person who had been fighting him, although he claimed to have told the police when they arrived. He also admitted that the defendant owed K.C. money and that K.C. had come to get the money owed him. He said that the defendant owed him and K.C. $6000. He denied that he had fabricated the story of the robbery to conceal his own reason to come to Tennessee—to recover money owed to him from drug transactions. He acknowledged he did not tell the 9-1-1 operator about the robbery and did not identify the alleged robbers. He said he did not recoup any of the money owed him from other sources during his stay in Tennessee.

Cleveland Police Officer Kevin Felton testified that he was one of the investigators involved in this case. He said he and Detective Gibson were called to the crime scene and began collecting and preserving evidence. He said they collected a .380 and a .44 caliber handgun. He said they found the .380 in the engine compartment of a car after someone told them where to look. He stated that underneath the .380 they found a pair of blue coveralls wrapped around the .44. He said he opened the .44 and saw one empty casing under the firing pin, with the "dent in the primer" revealing that the gun had been fired.

Officer Felton testified that they recovered a bloody red shirt that he let air dry to preserve the blood. He said they recovered a box of Winchester brand .380 ammunition at the intersection of Varnell and Hollow Roads. He said they also recovered potato remains from the Classic Suites Hotel room. He stated that a car, a black 1993 Mazda, was subsequently identified as the one used during the crime, that it was impounded, and that during an inventory of the car, they found a Maytag identification card bearing the defendant's name. Officer Felton said he took many statements during his investigation using cassette recorders. He said that all the detectives in his former unit used these tape recorders for preserving statements. He acknowledged that the detective unit investigating drug crimes used a digital recorder in addition to the cassette recorders. He stated

there had been a motion hearing on July 5, 2005, to request all materials that either the drug investigation unit or Officer Felton's unit had. He said he contacted the drug unit because they had also been at the crime scene on December 24, 2004. He stated that after requesting their information, Det. Duff Brumley told him that Brumley had already given Felton all the compact discs and cellular telephones that they had. Officer Felton said he did not remember receiving any CDs with the cellular telephones. He said Det. Brumley told him he would send him another copy burned from the original file that he had in his computer. He said he and all the co-defendants' attorneys received these CDs after that hearing. He said that he returned from a vacation the day of a second motion hearing regarding the date when he originally received the statements—on December 23, 2004. At this hearing, the defendants alleged that the State had some statements while the defendants did not. He said because there was testimony that he had received these CDs in December, he began to doubt himself and started to search for the CDs, which he said he found in his desk drawer. He said that he knew that all parties had a copy of these CDs and that he threw the "copies" into the dumpster outside the police department to try to save himself embarrassment. He said he had been stripped of his detective rank as discipline for his conduct and was a patrol officer at the time of the trial.

On cross-examination, Officer Felton testified that Tony Kincaid told him, Detective Gibson, and another officer that the weapons would be found in the car. He said co-defendant Kincaid accompanied them to the car. He said Kincaid told them he had worn the blue coveralls at the time of the events giving rise to the trial. He said Kincaid had red marks on his neck. He said he did not see any .44 casings in the area where the co-defendants and others would go to shoot fairly frequently. He stated that in Kincaid's statement from December 23, 2004, Kincaid said he went to the Classic Suites Hotel on December 22, 2004, in a black or blue Mazda. Officer Felton said the statement reflected the following information. Kincaid said he obtained a black revolver from his cousin Mitchell's house and placed it in his front jacket pocket. Kincaid said he was wearing clothing other than blue coveralls. He said he went to the hotel room to get "the girl." He said he did not recognize the African-American man who answered the door. He said the "prostitute" asked to leave. Kincaid said that the man who answered the door went into the bedroom area and punched him, that they fought, that the man began to choke him, that he removed the gun from his jacket, that they struggled over the gun, and that he shot the man. He stated that he was certain he was in the bedroom facing the living room when he shot the man and that he shot the man because he could no longer breathe. He said that this man was larger than he was and that he did not think the man was armed. He said that he did not know what kind of gun he used other than it was a black revolver and that he had not seen it before December 22, 2004. He also admitted drinking twelve beers and smoking marijuana before the events. He said he ran from the hotel room after the shooting, got into the car, where Richard Jerger was, and drove to a grocery store, where he called his father. He said neither he nor Jerger knew about a plan to harm anyone, and he claimed that Beto and K.C. did not release the girl. He said that the baja jacket in which he stored the gun was in his father's car but that he wore the coveralls during the shooting. In a longer, recorded statement, Kincaid said he drank eighteen beers.

Officer Felton testified that he threw away two CDs in the dumpster outside the police station. He said he transported Tony Kincaid to the hospital and that he told Kincaid to page him every day at 1:00 p.m. He said Kincaid complied with the request. He said he later told Kincaid to

turn himself in. He said that he did not ask Kincaid to consent to a search of the residences. He admitted that he did not know if any guns were stored in these residences.

Officer Felton testified that Jerger took him and Det. Gibson to the location where he had thrown the box of bullets out of the car window. He said Det. Gibson found the box under some leaves using a metal detector. He said Jerger told him the car was turning at the intersection at the time. Officer Felton stated that the defendant and co-defendant Massengill lived in a trailer park on the road before the intersection. He said that Jerger told him that he and the defendant had spoken with Scott Parker. He said that Jerger had given three statements in all to the police. He said that in the first statement, Jerger did not admit anything. He said Jerger talked about the events of December 22, 2004, in a second statement dated December 30, 2004, although he said Jerger did not mention a plan to commit armed robbery in this second statement. Regarding his third statement given a few days after his March 2005 arrest, Jerger was concerned about his possible parole violation, and Officer Felton said he told him that the officers would tell his parole officer that he had been cooperative with them. He said that in the third statement, Jerger admitted there had been a plan to rob the victims.

Officer Felton testified he did not submit any fingerprints to the TBI for investigation. He acknowledged that he only admitted receiving the CDs after Det. Brumley was investigated for aggravated perjury. He stated he had to vindicate Det. Brumley and to accept responsibility for his own stupidity. He said he did not listen to the CDs before he threw them into the dumpster.

On redirect examination, Officer Felton testified that he guessed the box of bullets was found approximately seven miles from the crime scene and less than one mile from the defendant's and co-defendant Massengill's residence. On recross-examination, he testified that Richard Jerger lived with the defendant and co-defendant Massengill.

Cleveland Police Detective Guy Ferguson testified that he investigated the homicide on December 22-23, 2004. He said he digitally recorded a statement that he downloaded to his computer to create a file. He said that he still had the file and could make as many copies of the file as were needed. He said that his normal practice was to erase the statement on his recorder after he downloaded the recorded statement to his computer.

Cleveland Police Detective Mark Gibson testified that he was called to the crime scene at the Classic Suites Hotel shortly after 11:00 p.m. on December 22, 2004, where he photographed the scene. He said he interviewed co-defendant Massengill on two dates, and her statement from the second interview was played for the jury. It was not included in the appellate record. He testified regarding the locations of the potato remains found in the hotel room. He said that he found the box containing bullets at the intersection of Varnell and Spring Hill Roads, which he said was less than five blocks away from the defendant's and co-defendant Massengill's residence.

Detective Gibson testified that he interviewed co-defendant Kincaid on December 23, 2004, and that Kincaid stated he placed the gun at different moments both into his jacket pocket and into his coveralls. He said that Kincaid later brought to the station the clothes he claimed to have worn during the shooting: black jeans and an orange shirt. He said that Kincaid later said he wore the blue

coveralls, which Det. Gibson said had the name "Dalton L." written on a bar-coded tag. He said the coveralls were found underneath a rusted car hood along with the .380 and the .44 weapons. His testimony corroborated Officer Felton's statements about the position of the items. He said that the .380 had a clip in it with one round loaded into the chamber and four rounds in the clip. He said the serial number on this gun had been removed.

Detective Gibson testified that Beto Villalobos identified the defendant from a photographic lineup. Det. Gibson said that he interviewed the defendant on December 23, 2004. He said the defendant told him he was from Texas and that he met up with three people at the Classic Suites Hotel: "T-Rock," "Pimp Stick," and "Big Boy." He said the defendant told him that a woman had taken him to the hotel, that he did not like Beto, and that he and the others would go shooting in Texas with a potato on the end of the gun barrel. He said the defendant, when presented with a photograph of co-defendant Kincaid, denied that that person was with him at the hotel. He said the defendant did not know who the red-haired woman in the hotel room was. Det. Gibson stated that he photographed the defendant during their encounter and that the defendant's right shirt sleeve was ripped, his right arm had scratches, and his left leg was scratched and bloody. He said the area from the Classic Suites Hotel to the defendant's home was brushy and had briars. The defendant's recorded statement was played for the jury, but it was not included in the appellate record.

On cross-examination, Det. Gibson testified that he detected a faint alcohol odor on the defendant. He stated that the defendant was held at the station and questioned in the early morning hours of December 23, 2004, and that he was held at the station until he was charged that same day at 8:00 p.m. He said the defendant was allowed to go home for Christmas and was required to turn himself in after Christmas. He said a "material witness," Michelle Bunting, was held for several days in jail when she could not make bond. He said that she had not been charged with any offenses relating to the December 22, 2004 events and that he had made no promises to her. He said that his inquiry into the identity of the three men the defendant identified by nickname led him to Paris Roofing, where no one knew anyone by these nicknames. He said, however, that Richard Jerger worked at Paris Roofing but that no one there knew him by a nickname. On redirect examination, Det. Gibson testified that they held the defendant at the station for such a long time because they thought he would flee. Det. Gibson stated the defendant said he was from Texas and had only been in the area since April or May 2004.

Michelle Bunting Teffeteller[1] testified that she was a prostitute at that time and that she was with co-defendant Heather Massengill doing laundry at Massengill's mother's home on December 21, 2004, when Massengill received a telephone call that she said was a Texas telephone number. Teffeteller said Massengill told her she thought Beto or K.C. was calling. Teffeteller said Massengill became very anxious after she saw the telephone number on the caller identification. She said that Massengill told the defendant about the telephone call and that he, too, became anxious. She said that Massengill dialed the phone number. She stated that when they all returned from the mother's home to Massengill's and the defendant's residence, they talked about K.C., Beto, and a feud that began the year before. She said they talked about retaliation and a possible robbery. She said the

---

[1]At the time of trial, the witness had married and had taken the name "Teffeteller."

two of them made some telephone calls to try to organize the robbery. She stated that the defendant said that either Beto or K.C. "had a sentence," had to turn himself in, and would not have any weapons during the trip because of the sentence. She said the defendant also stated that Beto and K.C. were probably coming to sell drugs. She said that all three of them were smoking marijuana.

Ms. Teffeteller testified that on December 22, 2004, co-defendant Massengill came to her house and asked her if she wanted a client. She said she accepted the job because she needed money to visit her son for Christmas. She said that she got ready at the defendant's home and that the three co-defendants and Richard Jerger were there, as well. She said that she knew from the day before about the planning to rob Beto and K.C., and she said she asked the defendant and co-defendant Massengill about her safety during her appointment. She said she did not recall whether the defendant was talking about the robbery before they left. She admitted she had used marijuana and muscle relaxants during this time at their residence. She said that she and Massengill then left to meet K.C., her client, at a gas station for K.C. to see her and agree to the transaction but that they bought bullets at Wal-Mart first. She said she spoke to Massengill in the Wal-Mart parking lot again about her safety during her appointment. She said Massengill told her to listen to the defendant. She said that she left with K.C. and went to his hotel room. She said that while she was in the hotel room, she heard Massengill's voice at the door a few times but that she could not hear what was said. She said the defendant then came to the door and told her "very sternly" to leave. She said she left through the back door. She said that Massengill was not waiting for her there as was planned, that she heard sounds of wrestling and "banging around" in the hotel room, and that she saw the curtains rustling. She said she heard the defendant say, "I don't want to shoot you" twice. She said she heard noise and then silence. She stated that the co-defendants then ran out the door but that she did not remember whether they used the front or back door. She said she ran with them because she did not know where else to go. She stated that she got into the defendant's black car and that co-defendant Kincaid drove, the defendant sat in the passenger's seat, and she and Richard Jerger sat in the back. She said that the men got out of the car, while she remained in the car shaking. She said she was "pretty high" then because she had smoked more marijuana while in the hotel room. She said, however, she remembered the defendant crying out, "I'm penned, I'm penned. What am I gonna do?" She said the defendant meant that he was going to the penitentiary. She said that the car stopped at a shed in a rural area, that Kincaid got out, and that it was dark. She stated that they drove briefly onward but that the car broke down. She said she, the defendant, and Richard Jerger walked over roads and pastures to the defendant's residence. She said that they gathered "a bunch of things together" and that she and Jerger went back to his former apartment. She said she and he were having an affair. She said they smoked more marijuana and then returned to the defendant's residence.

On cross-examination, Ms. Teffeteller said she had not met Kincaid before December 22, 2004, and had not heard him discuss any plans with Richard Jerger or the co-defendants. She said she did not see Tony Kincaid talking with the others about the robbery because he was in Jerger's bedroom at the defendant's home. She said Jerger and the defendant were talking about the robbery in the kitchen. She said she did see Kincaid drinking beer. She said she heard K.C. close and lock the door at the hotel room. She said that the lights in the hotel living room were on and that the lights outside were on, although dim. She said Beto arrived after she had "performed." She said K.C., Beto, the defendant, and Kincaid were in the hotel room when she was told to leave. She said

that while she did not mention a robbery during her preliminary hearing testimony, it was because she was nervous and had time in the interim to recollect the events. She did not remember saying in the preliminary hearing that she did not know what the defendant said while in the room. She stated that at the time of the December 22 events, she had smoked two marijuana "cigars" and two or three "joints" and had taken two muscle relaxants. She said that she had been a prostitute off and on since she was fifteen. She admitted that her then-five-year-old son lived with her mother in Michigan but denied that she did not have custody of her child. She said she moved to Tennessee in October 2004 to change her lifestyle. She said she called a friend in Tennessee after she kept relapsing into drug abuse and that her now-current husband offered her a place to stay. She said that she was arrested and held as a material witness and that she gave a statement dated January 13, 2005, after speaking with a detective. She stated that while she was living with her friend, she also moved in with Richard Jerger. She said that in the eight months since the preliminary hearing, she had returned to her friend and had lived with him. She stated she was diagnosed with bipolar disorder and was in treatment. She said she had been drug-free for thirty days. She stated that she had not been charged for any role in the December events and that she had not received a promise that she would not be charged in exchange for her testimony. She said she was not aware that Jerger had given a statement in which he implicated her as a co-conspirator. She denied having participated in the planning of the robbery and shooting. On re-direct examination, she stated that the defendant said the victims would have money and drugs.

Monica Datz, the assistant director for forensics in the Bradley County Sheriff's Office and accepted as an expert witness in forensic sciences and latent fingerprint examination, testified that no identifiable prints were found on either handgun. On cross-examination, she testified that she did not personally examine the guns.

Richard Jerger testified that he had prior convictions for aggravated burglary, theft, six automobile burglaries, escape, vandalism, and having contraband in jail. He agreed that he was a co-defendant in this case and faced the same charges as the defendant and the other co-defendants. He stated that no promises had been made to obtain his testimony and that he was not testifying in the hope that he would receive a specific reward or sentence for his testimony. He explained that his decision to testify was based on his religious conversion and his being raised to accept responsibility for his actions. He said he pled guilty to all of the prior charges and accepted responsibility for them.

He testified that he met Tony Kincaid and the defendant while he worked at Paris Roofing. He said that he and the defendant were best friends and that he had lived with the defendant and Heather Massengill. He said he continued to work with Kincaid and Kincaid's father after he lost his roofing job. He stated that this court appearance was the first time he had seen Beto Villalobos. He said he had met K.C. once or twice at the defendant's barbecues. He said the entire story began when the defendant telephoned him while he was with his wife. He said that when the defendant and Massengill picked him up from his home, the defendant told him he had a plan to rob K.C., the defendant's cousin. He said the defendant told him K.C. had either marijuana or money. He said this conversation occurred the day before the shooting. He said the defendant asked him to go to the Classic Suites Hotel to look for Texas license plates and to call them with the results. He stated that he called them after finding two cars with Texas license plates and that they all returned to the

defendant's home.  He said the original plan on December 21, 2004, involved his and an undetermined person's going into the hotel room with guns.  He said the defendant, Massengill, and Michelle Bunting made telephone calls to find a second person.  He said, however, that because they lacked the guns and a second person, they temporarily gave up the idea.

Mr. Jerger testified that the defendant revived the plan later the following day.  He said he and the defendant went to Jerry Kincaid's home after running some errands.  He said that the defendant continued to talk about the robbery idea and that Jerry Kincaid said it was a stupid plan. He said he had contacted Jerry Kincaid the previous day as a candidate for the robbery.  He said, however, that the defendant's mention of the quantity of marijuana piqued Tony Kincaid's interest. He said Tony Kincaid talked with Jerry Kincaid in another room and that Tony Kincaid told them not to leave without him.  He said he asked Jerry Kincaid for guns, after the defendant had asked him to do so.  He said Jerry Kincaid denied his request.  Jerger said that Jerry Kincaid gave Tony Kincaid a .380, although Jerger said he did not see Jerry Kincaid hand the gun to the co-defendant.  He said that when they were getting ready to leave, Tony Kincaid got into the car and handed the defendant a gun.  He said that Kincaid stated he was serious about the robbery.  Jerger stated that this gun lacked bullets.  He said that he, the defendant, and Kincaid went to the Kincaid's trailer, where Kincaid obtained a second gun, a revolver in a camouflage case.  He said they drove to the defendant's home, where the three of them met up with Massengill and Michelle Bunting.  He said that he, the defendant, and co-defendant Kincaid were in the back bedroom and that Michelle Bunting was getting ready for her appointment.  He stated that the defendant sent Massengill to buy bullets when she drove Michelle to her appointment.  He said Massengill returned with the bullets and a six-pack of beer.  He said she set the bullets in the living room and that the defendant brought them to Kincaid.  Jerger said that the defendant wore gloves to load the guns but that Kincaid loaded the gun because years of roofing work had sloughed off Kincaid's fingerprints.  He said he, the defendant, and Kincaid left with the two guns.  Jerger said the defendant bit off the end of a potato and inserted the rest onto the end of the gun barrel.  Jerger stated the defendant told him he had seen this work as a silencer in a movie.  Jerger said the new plan was for the defendant and Kincaid to enter the hotel room.  He said he "was out of it."  He said the defendant drove the three of them in the black Mazda to the nearby Classic Suites.  He said he sat in the back seat.  He said they parked the car near a building and behind a dumpster to prevent it from being seen.  He said that they asked him if he wanted to go into the hotel room but that he did not accept and remained inside the parked car.  He stated that he then heard a "commotion" and that he saw the defendant walk down a hill to another hotel.  He said he saw the defendant then turn back.  He said he tried to attract Michelle Bunting's attention, but to no avail.  He said Kincaid came "hunched over" to the car and told him to move.  He said he got into the car after the defendant and Michelle Bunting.  He claimed not to have heard a gun shot.

Mr. Jerger testified that while in the car, Kincaid drove, the defendant sat in the passenger seat, and he and Michelle sat in the back.  He said he asked what had happened, and he said the defendant stated, "Tony shot K.C."  He said the defendant also said that K.C. was talking when he left and that he did not know if he died.  He said they drove to Tony's brother's trailer.  He said that they still had the two guns and that the box of bullets was at the defendant's home.  He said the defendant gave the guns to Kincaid, who was taking one of them back to Jerry Kincaid.  He stated that the defendant's black Mazda was having difficulties and that they left it where it finally broke

down. Jerger said that upon arriving at the defendant's home, he retrieved Kincaid's wallet from his bedroom and put it into a bag with the box of bullets and the name tag on the coveralls. He said Kincaid had told him to destroy all of these items. He stated that they left the home and that he threw out the box of bullets at an intersection. He said he threw the gun case out later. He said they ended up at the defendant's home later that night. He stated that at some point in the planning of the robbery, Massengill had said she would puncture the tires of the Texas cars to prevent K.C. and Beto from leaving.

Mr. Jerger testified that in his first statement to the police, he told a false story to help the defendant. He said this story was not internally consistent. He claimed the statement he made a few days after his arrest was the truth and that he spoke with the officers because his wife wanted him to tell the truth. He said he had been "saved" and did not want to lie any longer.

On cross-examination, Jerger testified that Michelle Bunting was mistaken in stating they had an affair. He denied spending the night with her. He admitted, however, that he called "Mitchell" on Michelle's behalf to find a client for her. He said that Joey Blair was present when he made his telephone call to Mitchell. He said it was possible that Kincaid drank more than a twelve-pack of beer that night, and he said he thought the others had been smoking marijuana outside Mitchell's house before he arrived. He said he fabricated stories, including that he would only have to serve the balance of his prior sentence, to avoid being considered a "snitch" in jail. He said he had no reason to believe that Scott Parker would misstate his involvement in the planning of the events. He said Michelle Bunting had called someone named "Pimp Stick" to ask him to participate in the robbery. He said that although the defendant currently was missing his front teeth, the defendant had his teeth the day of the shooting when he bit the end off a potato. He denied that he went by the nickname "Pimp Stick." Regarding his second statement, he said he never mentioned an armed robbery because the detectives did not ask him about that. He said he gave his third statement after he had spent a few days in jail after his arrest. He said he did not mention his religious conversion, either, during the statement because he had not been asked about it. He agreed that he had been "saved" about one month before his arrest but that he did not come forward immediately with his third statement, the one he said was the truth. He acknowledged he only came forward with this statement after spending three to four days in jail and inventing a second statement. He acknowledged that he did not tell them the truth sooner after being saved. He claimed not to know the potential sentences he faced for his charges, which were the same as the defendant and co-defendants.

Bradley County Sheriff's Lieutenant John Collins testified that he found an abandoned vehicle during the night of December 23, 2004. He stated that the car was a traffic hazard and that he had it towed from the intersection of Blythewood and Harris Creek Roads. He said the car had only a "drive-out tag" that did not convey any registration information. He said he walked to the car, looked inside, and saw a name tag bearing the name "Dalton Lister." He said he remembered the name from the roll call the previous night identifying the defendant as a possible suspect in a shooting. The State rested.

Gilbert Morgan "Joey" Blair testified for Tony Kincaid. He said that he knew Kincaid but that he did not know Heather Massengill. He said that he did not know Beto or K.C. but that he

received a telephone call from Richard Jerger, who asked him about a redheaded prostitute. He said that the defendant came to his house later and that Kincaid was drunk. He said some people were smoking marijuana outside his home. He said he never heard Kincaid, the defendant, and Richard Jerger talk about a planned robbery. He remembered hearing them talk about a redhead in a hotel, who was the same woman Jerger had inquired about during the telephone call. He said that Kincaid said he would go to her. He said he had not seen either Tony Kincaid or Jerry Kincaid with the two guns. He also stated that he was "not allowed around guns."

On cross-examination, Joey Blair testified that the defendant and Tony Kincaid shot guns behind his house but not around him or his children. He did not remember giving a sworn statement that the defendant had pistols and that he would be outside with them while they were shooting.

Chris Baxter was called as a witness by Tony Kincaid. He acknowledged knowing Beto Villalobos, the defendant, K.C., and Heather Massengill. He denied knowing Kincaid. He said he knew that Beto or K.C. would come in December to Tennessee, although he said he did not know the specific date. He said that he knew Beto enjoyed hang gliding, but that the hang gliding facility in the area closed in September or October, and that it would not have been open in December. He said he and Beto had not discussed plans to go hang gliding in December. He said that he did not owe Beto any money, that he "sort of" knew why Beto had come to Tennessee, and that it was not because he owed him money. He also stated Derrick Hartline did not owe Beto money. On cross-examination, he denied that either Beto or K.C. had ever given him money to purchase drugs. After being granted use immunity, he agreed that he received marijuana from Beto or K.C. He said that they would bring the marijuana, which he would sell and then pay them the proceeds, minus his share of the money.

Jerry Kincaid was called by Tony Kincaid. He testified that he saw his cousin Tony on a daily basis. He said he knew the defendant, Richard Jerger, and Joey Blair. He said several people were at his home on December 22, 2004. He said he spoke with Det. Felton about a phone call he received. He said that he and Tony Kincaid were drunk and that after the phone call occurred, the defendant and Jerger came. He denied the guns involved in the crime were his or Tony's guns. He said he had not seen Tony with the guns. On cross-examination, he acknowledged his bad memory. He said that his gathering was loud and that he could not hear what the people involved in this case had been saying.

David Rigsby testified that he drove to Tennessee on December 23, 2004. He said he thought the name of the hotel was Classic Suites. He said his wife went inside the hotel to register while he waited in the truck. He said their room was next door to the room involved in the present case. He said that he saw one Hispanic man leave the hotel room and that a large African-American man filled the entire doorway when he hung his arms from the doorframe. He said the first man looked back at the larger man, who said, "Come back in the room. We'll settle it like men." He said he and his wife parked their car and began unloading their baggage and dogs into the room next to the two men's room. He said the first man returned to the room. He said that he saw two other men a few doors down but that they had disappeared by the time he turned around holding some luggage. He said that inside their hotel room a few minutes later at approximately 10:00 p.m., he and his wife

heard a fracas next door. He said the walls were shaking. He said his wife took the dogs to the hotel office to inquire about another room.

On cross-examination, Rigsby testified that the larger man had a calm demeanor. He said this smaller man called 9-1-1. He said that he did not know at the time the larger man had been shot and that this man was sitting in a chair when he saw him.

Rhonda Rigsby testified that she and her husband were traveling to Florida when they stopped at the Classic Suites to spend the night. She said she heard a loud argument in the room next door. She said that she walked to the hotel office to inquire about moving to another room but that she saw a woman in the room next door "being shooed away" from the front door. She said this woman approached her in the parking lot and asked where a gas station was. She said she pointed out the gas station she and her husband had passed and walked to the office. She said this woman's demeanor was calm.

A jury convicted the defendant of all four counts. The jury convicted Tony Kincaid of two attempted aggravated robberies but could not reach a verdict for the charges of felony murder and conspiracy to commit aggravated robbery. Heather Massengill was convicted of facilitation of felony murder, two counts of facilitation of attempted aggravated robbery, and conspiracy to commit aggravated robbery.

The defendant contends (1) that the evidence was insufficient to convict the defendant of the charged offenses; (2) that the trial court erred by severely limiting the cross-examination of Richard Jerger regarding his criminal record, which the defendant claims was substantial and would have affected the jury's assessment of his credibility as a prosecution witness; (3) that the trial court erred by failing to suppress a recorded statement of the defendant when the original recording was intentionally destroyed and lost by the detective who had possession of it; and (4) that the trial court erred in not providing Officer Felton's statement to the Tennessee Bureau of Investigation concerning the lost and destroyed original recording of the defendant's statement taken the night of the homicide. Although responding to each of the defendant's issues, the State initially asserts that the defendant has waived his issues except sufficiency because he failed to file a timely motion for new trial and that a plain error analysis is inappropriate in this case.

The record reflects that the defendant's judgments were entered April 12, 2006. However, the first of two motions for new trial was filed on May 17, 2006, outside the thirty-day filing limit. See Tenn. R. Crim. P. 33(b). A court cannot extend the time for the filing of this motion. Tenn. R. Crim. P. 45(b)(3). "A trial judge does not have jurisdiction to hear and determine the merits of a motion for new trial that has not been timely filed." State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). In the present case, the trial court held a hearing on the motions and denied the motions for new trial in orders dated November 6 and 7, 2006. We note the transcript for the hearing was not included in the record. Although the trial court considered the motions, "the trial judge's erroneous consideration of ruling on a motion for new trial not timely filed . . . does not validate the motion." Id. at 569. By failing to file a timely motion for new trial, the defendant has waived his issues on appeal other than sufficiency of the evidence. State v. Boxley, 76 S.W.3d 381, 389-90 (Tenn. Crim. App. 2001). See State v. Martin, 940 S.W.2d at 569 (stating that failure to file a timely motion for

new trial "deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial."). Also, we conclude that plain error does not exist. Because this court waived the filing of the notice of appeal in the interest of justice in a May 4, 2007 order, the issue of sufficiency is properly before us. See T.R.A.P. 4(a).

The defendant contends that the evidence was insufficient to convict him of all the offenses because (1) the jury could not decide regarding the self-defense claim by the shooter, Tony Kincaid, to charges of conspiracy to commit aggravated robbery and felony murder, yet it convicted the defendant of both offenses and (2) the evidence presented to convict the defendant came from eyewitnesses with "much to lose," while testimony regarding the defendant's theory of a fight came from neutral parties. The State replies that the evidence presented at trial was sufficient to convict the defendant of the charged offenses beyond a reasonable doubt. It also asserts that the fact the jury did not reach a verdict as to a co-defendant is irrelevant to consideration of the sufficiency of the evidence against the defendant.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Pertinent to this case, first degree felony murder is defined as: "A killing of another committed in the perpetration of or attempt to perpetrate . . . robbery" when the perpetrator had the intent to commit robbery. T.C.A. § 39-13-202(a)(2), (b) (2003). The evidence reflected that the defendant entered the hotel room of K.C. and Beto with Tony Kincaid with the intent to rob them of their money. The evidence showed the defendant and Kincaid discussed the planning of the robbery, obtained weapons to use during the robbery, determined the victims' hotel, and announced to the victims that they were there to rob them. The evidence showed that the defendant conceived the plan because he knew the two men would not be armed. The evidence showed that Kincaid shot K.C. fatally during their struggle while the defendant fought with Beto loudly enough to shake the walls of an adjoining hotel room. The evidence showed that the robbery plan did not succeed and that K.C. died from the bullet wound. In one of his claims, the defendant asks us to reweigh the credibility of witnesses, a task we cannot perform. See State v. Sheffield, 676 S.W.2d at 547; State v. Cabbage, 571 S.W.2d at 835 (Tenn. 1978); T.R.A.P. 36(a) ("relief may not be granted in contravention of the province of the trier of fact"). As to the defendant's other claim, we repeat that "verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency." State v. Hamrick, 688 S.W.2d 477, 481 (Tenn. Crim. App. 1985) (quoting Pulley v. State, 506 S.W.2d 164, 169 (Tenn. Crim. App. 1973)). The defendant is not entitled to relief.

Attempted aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" "[a]ccomplished with a deadly weapon" or "[w]here the victim suffers serious bodily injury." T.C.A. §§ 39-13-401(a), -402(1), (2) (2003).

A person commits "criminal attempt" by acting "with intent to complete a course of action or cause a result that would constitute the offense, . . . and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3) (2003). The defendant announced to K.C. and Beto his purpose to rob them. He drew his loaded gun and demanded their money. A struggle ensued among the four men, during which the defendant was unable to carry away any of the victims' money. The evidence reflects, however, that he told Tony Kincaid to shoot Beto and that he shut the door Beto had opened for outsiders to see what was occurring inside the hotel room. While the defendant alleges that only a fight occurred, we must presume that the jury rejected this claim and placed him, armed, at the victims' hotel room in view of its verdict convicting the defendant. He is not entitled to relief from these convictions.

To convict a defendant of conspiracy to commit aggravated robbery, the jury must find (1) that the defendant entered into an agreement with at least one other person to commit aggravated robbery, (2) that each of the parties to the conspiracy had the intent to commit the offense of aggravated robbery, (3) that each party acting for the purpose of promoting or facilitating the aggravated robbery had agreed that one or more of them would engage in the conduct constituting the offense of aggravated robbery, and (4) that one of the parties to the conspiracy committed an overt act in furtherance of the conspiracy. See T.C.A. § 39-12-103 (2003). The evidence reflected that the defendant wanted to rob Beto and K.C. and that he told others about his plan. He selected the victims because he knew they would be unarmed, although they would be traveling with money and drugs. The evidence showed he, Heather Massengill, and Richard Jerger searched for another party to rob the victims along with the defendant. He and Tony Kincaid obtained the weapons. Heather Massengill and Michelle Bunting went to the Walmart where Massengill purchased bullets to use in the robbery. The evidence showed that the defendant and Kincaid were chosen to be the robbers, that they entered the victims' hotel room armed, and that they announced their purpose to Beto and K.C. The defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-18-